# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1890

_____

International Paper Company,

        Appellee,

v.

United Paperworkers International
Union; United Paperworkers
International Union, Local 735;
International Brotherhood of
Electrical Workers,

        Appellants.

\*
\*
\*
\*
\*  Appeal from the United States
\*  District Court for the Eastern
\*  District of Arkansas.
\*
\*      [PUBLISHED]
\*
\*
\*
\*
\*

_____

Submitted:  December 15, 1999

Filed:  June 12, 2000

_____

Before BEAM, HEANEY, and HANSEN, Circuit Judges.

_____

BEAM, Circuit Judge

     The United Paperworkers International Union, its Local, and the International Brotherhood of Electrical Workers (collectively, "the Union") appeal the district court's order vacating an arbitration award. We affirm the district court.

## I. BACKGROUND

International Paper Company ("the Company") owns and operates a paper mill in Pine Bluff, Arkansas. The production and maintenance workers at the mill are members of the Union. The workers are covered by a collective bargaining agreement (CBA) with the Company. The 1993 to 1998 CBA was in force at the time of the dispute at issue in this case.

The CBA provides that "maintenance employees are generally expected to perform operating maintenance, preventive maintenance and day-to-day equipment repairs." CBA Article XVII § (B)(1)(b). Another provision in the agreement requires the Company to employ a "crew sufficient to do the work required in each department," including maintenance. CBA Article XVII § (A)(1). The CBA also recognizes, however, that "situations may arise which will necessitate the use of outside forces to perform such work." CBA Article XVII § (B)(1)(b). In such cases, "when outside forces are in the Mill to perform such work," the agreement provides for a "matching hour penalty," that requires employees to be offered overtime to the same extent as the outside forces. CBA Article XVII § (B)(1)(b).

The parties' bargaining history shows that over time the parties have agreed to accept more work by outside contractors. Before 1983, the agreement generally prohibited subcontracting of maintenance work except in very limited circumstances. Both the 1983 and 1990 agreements relaxed the maintenance subcontracting restrictions.

The "crew sufficient" language was first proposed by the Union and added to the CBA in 1970 in response to concerns that crews were often understaffed and it was unfair, for example, to require three employees to do the work of four. The language appeared in two places in the 1983 and 1990 agreements: in Article XVII, paragraph (A)(1) (referring to all departments) and again in paragraph (C)(1)(a), the paragraph

that refers to subcontracting of maintenance work. Although the first reference to "crew sufficient" still appeared in the 1993-98 CBA, the second reference to the "crew sufficient" language was deleted from the agreement.

On February 15, 1994, the Company shut down a large piece of equipment for eight hours of routine preventive maintenance work and hired an outside contractor to perform the work. The Union filed a grievance asserting that the Company had violated the terms of the contract by hiring outside contractors to perform routine maintenance. The Union contended that the "crew sufficient" language required the Company to maintain a maintenance work force of 186 general maintenance (GM) engineers and that the Company had failed to maintain that work force level. Its desired settlement was that the Company "hire enough GM's to replace retired GM's and future GM's as they retire." The Company was also asked to "[s]top this practice of using [outside workers] on [preventive maintenance] for shut-downs." The Company denied the grievance asserting that the shutdown was a situation that necessitated "the use of outside forces to perform such work" under the contract.

The matter proceeded to arbitration. After a hearing, the arbitrator found that, although the "crew sufficient" language of the contract did not require the Company to maintain any particular number of maintenance employees, it obligated the Company to hire enough employees to accomplish the work of the maintenance department. The arbitrator thus found that the "employees of the Maintenance Department [had] the right to perform operating maintenance work, preventive maintenance work, and day-to-day equipment repairs" and ordered the Company to "cease and desist from the practice of using contractors or any outside forces to perform that work."

The Company appealed the decision to the district court. On cross-motions for summary judgment, the district court found that the arbitrator's award "fails to draw its essence from the contract" and vacated the award. The Union appeals.

## II.    DISCUSSION

The scope of judicial review of an arbitrator's decision is narrow.  See Alvey, Inc. v. Teamsters Local Union No. 688, 132 F.3d 1209, 1211 (8th Cir.1997).  A court may not reconsider the merits of an award even if  the award rests on errors of fact or on a misinterpretation of the contract.  See id.  As long as an arbitrator's award draws its essence from the collective bargaining agreement, the award is legitimate.  See id. A court cannot interfere with the arbitrator's award unless the contract is not susceptible of the arbitrator's interpretation.  See Kewanee Machinery Div. v. Local Union No. 21, 593 F.2d 314, 318 (8th Cir.1979).

In deciding whether an award draws its essence from the agreement, we must decide whether the award is simply a mistaken interpretation of the contract that we must uphold, or whether it violates the fundamental principle that "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."  United Steelworkers v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597 (1960).  Although an arbitrator may look to outside sources to aid in interpreting a collective bargaining agreement, he must construe the contract and he may not amend it.  See Keebler Co. v. Milk Drivers and Dairy Employees Union,  80 F.3d 284, 288 (8th Cir.1996).

We agree with the district court that the award does not draw its essence from the contract.  The award effectively nullifies the contract language stating that "situations may arise which will necessitate the use of outside forces to perform such [preventive maintenance] work."  The failure of the CBA to define those situations does not justify writing them out of the contract altogether. Moreover, the course of dealing, bargaining history, and industry custom supports the Company's contention that a shutdown may qualify as such a situation.  In addition, an injunction banning the use of all maintenance subcontracting ignores the agreement's express provision of a "matching hour penalty" in the event of the use of such outside contractors.  The Union

concedes that even if the Company were to employ a "crew sufficient" in the maintenance department, there would still be situations that required outside contractors to do maintenance work. Thus, we find that the arbitrator's broad injunction banning the use of outside contractors for all preventive maintenance contravenes the contract.[1]

The Union's reliance on the "crew sufficient" language as essentially a condition precedent to the Company's use of outside contractors for maintenance is misplaced. We find no support in the record for the contention that the Company agreed to maintain any specific number of maintenance employees. The record supports the Company's contention that the "crew sufficient" language in the agreement is aimed at the problem of overworked employees and not the outside-contracting-of-maintenance-work issue. This is shown by the bargained-for deletion of the "crew sufficient"

---

[1]The dissent contends that the court simply disagrees with the arbitrator's construction of the agreement and implies that the court engages in result-oriented jurisprudence. This is simply wrong.

The arbitrator's decision does not draw its essence from the contract because it is expressly contrary to the terms of the agreement. The arbitrator framed the question thusly: "Did the Company violate the contract by its assignment of preventive maintenance work to outside contractors on February 15, 1994? If so, what shall be the remedy?" He never answered the framed question "yes" or "no." If he had done so, he would have been forced to decide if the eight-hour shutdown was a "situation" where the CBA permitted the Company to bring in outside contractors to do the work pursuant to the provisions of Article XVII § (B)(1)(b). Instead, he issued a blanket injunction against the Company ever hiring outside workers to do preventive maintenance work. That blanket prohibition eviscerates and writes out of the CBA the language that permits the Company to hire outside workers to do preventive maintenance work in certain "situations." The real issue, avoided by the arbitrator but clearly within and the object of his statement of the issue, was whether the eight-hour shutdown was one of those "situations" where the CBA gave the Company the right to bring in outside workers. The arbitrator did not interpret the contract, he rewrote it.

language in the portion of the contract dealing specifically with subcontracting maintenance work.

## III.   CONCLUSION

For the above reasons, the judgment of the district court vacating the arbitrator's award is affirmed.

HEANEY, Circuit Judge, dissenting.

The majority overturns the arbitrator's award simply because it disagrees with the arbitrator's decision.   The Supreme Court and our court have consistently disapproved such activism.

## I.   BACKGROUND

The facts giving rise to this case are quite simple.  On February 15, 1994, the Company shut down a paper machine to perform eight hours of <u>routine</u> maintenance work.   It assigned that work to an outside contractor, rather than to its Union employees.   The Union filed a timely grievance objecting to the assignment.   The parties agreed to arbitrate the dispute.   The CBA provides that the decision of the arbitrator shall be final and binding.

At the outset of the hearing, the Union and the Company were unable to agree on the issue to be arbitrated, but stipulated that the arbitrator should frame the issue. The arbitrator framed the issue as follows:  "Did the Company violate the Contract by its assignment of preventive maintenance work to outside contractors on February 15, 1994?  If so, what shall be the remedy?"  (J.A. at 57.)

In defense of its position, the Company claimed that it was permitted by the CBA to use non-Union employees to perform routine maintenance work. Article XVII § (B)(1)(b) of the CBA states:

> The Company recognizes that maintenance employees are generally expected to perform operating maintenance, preventative maintenance and day-to-day equipment repairs. However, situations may arise which will necessitate the use of outside forces to perform such work.

(J.A. at 108.)

The arbitrator agreed that the governing provision was Article XVII(B)(1)(b). However, he found that the language in the second sentence of this Article was ambiguous in that it did not define what type of "situations" would arise that would permit the company to use outside contractors for work that Union employees are typically entitled to perform. He construed the ambiguity against the Company because it authored this provision.

The arbitrator then stated:

> As described by the Company[,] the disputed work involved checking rotating equipment bearings that could only be checked while the equipment was not operating, and referred to that work as "preventive maintenance." The Company has conceded that such work is normally performed by General Mechanics in the Maintenance Department, but argues that the use of contractors in this instance was justified by (a) the necessity to complete it within the scheduled time frame of 8 hours, (b) not all the work could be performed by General Mechanics, (c) all available General Mechanics were being utilized, and (d) the decision to use a contractor was justified as opposed to interrupting work in other areas of the Mill, and was based on sound business practices.

Under other circumstances such reasons for the decision could be sound, but the problem with the Company's rationale in these circumstances is that it is based on exceptions which are not authorized by the Contract, such as Article XVII(B)(2). The Contract doesn't say <u>routine</u> maintenance work will be performed by General Mechanics "except" when there is a time scheduling problem, or "except" when all the General Mechanics are being utilized, or "except" when work in other areas would have to be interrupted, or "except" when the decision to use contractors is based on sound business practices.

The Company has no absolute right to employ contractors at will. It must do so within the restrictions imposed by the Contract. The decision to use contractors can't be justified on the basis of enlightened management, labor costs, work efficiency, area priorities, available manpower, etc. The question is simply what is allowed by the Contract.

(J.A. at 70-71 (emphasis added).)

Because the Company's use of outside contractors to perform maintenance work was not specifically permitted by the CBA, he ruled that such use of outside contractors in this circumstance violated the CBA.

## II. DISCUSSION

It is well established that federal policy strongly favors arbitration as a means of resolving labor disputes. See United Paperworkers Int'l Union v. Misco, 484 U.S. 29, 37 (1987); Kewanee Mach. Div. v. Local Union No. 21, Int'l Bhd. of Teamsters, 593 F.2d 314, 316-17 (8th Cir. 1979). Accordingly, our review of an arbitrator's decision is "extremely limited." United Food & Commercial Workers, Local No. 88 v. Shop 'N Save Warehouse Foods, Inc., 113 F.3d 893, 894 (8th Cir. 1997). We must construe the arbitrator's award broadly, resolving all doubts in favor of its validity. See id. at 895. "Because the parties have contracted to have disputes settled by an arbitrator

chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." Misco, 484 U.S. at 37-38.

Contrary to the majority's assertion, the arbitrator did not nullify any contract language. He simply construed the CBA in a manner that was unacceptable to the Company and unacceptable to the majority. The arbitrator disregarded a portion of the CBA that he found too ambiguous to be given any meaning. Absent that portion of the CBA, he found no support for the Company's position.

The arbitrator then ordered the Company to comply with the CBA. The majority asserts that this part of the award bans the use of all maintenance subcontracting, contravening the plain language of the CBA. I disagree. The arbitrator's award recognized that the Company may still use outside contractors, but required that the Union workforce be fully utilized before the Company used outside contractors to perform routine maintenance.

Because the majority is not satisfied that the arbitrator's decision was the right one, it undertakes its own review and substitutes its own interpretation of the contract for that of the arbitrator. This conflicts directly with the Supreme Court's restriction on such practices. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Misco, 484 U.S. at 38; see also Shop 'N Save Warehouse Foods, 113 F.3d at 895; John Morrell & Co. v. Local Union 304 A of the United Food & Commercial Workers, 913 F.2d 544, 559 (8th Cir. 1990). The arbitrator's result is fully supported by the record. Therefore, the decision should not have been disturbed by the district court, nor should it be disturbed by this court. Accordingly, I cannot join in the majority's affirming opinion.

## III.  CONCLUSION

When we review arbitration cases, whether or not this court would reach the same conclusion as the arbitrator is not the issue.  Rather, we are obligated to broadly consider whether there is any support in the record for the arbitrator's award, irrespective of whether we believe the arbitrator reached the right conclusion.  We are not permitted to micro-manage the business of arbitration.  The arbitrator's award is what the parties bargained for, and the award is supported by the record.  Under the well-settled precedent of the Supreme Court and this court, the award must stand.  I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.